UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

CORTNEY LOWE,                          )
                                       )
              Plaintiff,               )          3:19-CV-00524
                                       )
       vs.                             )
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
              Defendant.               )

**AMENDED MEMORANDUM OPINION AND ORDER[1]**

This matter is before the United States Magistrate Judge with the consent of the parties and by order of reference [Doc. 17] for disposition and entry of a final judgment. Claimant first filed an application for Supplemental Security Insurance Benefits ("SSI") under the Social Security Act, Title XVI, on April 21, 2017. The application was denied on December 6, 2018, following a hearing before an Administrative Law Judge ("ALJ"), and the Appeals Council denied Claimant's request for review of that decision on October 30, 2019. This action is for judicial review of the Commissioner's final decision per 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). Each party filed a dispositive motion [Docs. 15 & 18] and supporting memorandum [Docs. 16 & 19].

I.     **APPLICABLE LAW – STANDARD OF REVIEW**

A review of the Commissioner's findings is narrow. The Court is confined to determining (1) whether substantial evidence supported the factual findings of the ALJ and (2) whether the Commissioner conformed to the relevant legal standards. 42 U.S.C. § 405(g); *see Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). "Substantial evidence" is evidence that is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It

---

[1] This Amended Memorandum and Opinion is entered by the Court pursuant to Fed. R. Civ. P. 60 (a) as the Court has determined that certain portions of its ruling should be further clarified. This Amended Memorandum and Opinion do not alter the Court's initial ruling in the case.

must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact. *LeMaster v. Sec'y of Health & Human Servs.,* 802 F.2d 839, 841 (6th Cir. 1986). A court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if a court were inclined to resolve factual issues differently, the decision must stand if substantial evidence supports it. *Listenbee v. Sec'y of Health & Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). At the same time, a decision supported by substantial evidence "will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

A claimant must be under a "disability" as defined by the Act to be eligible for benefits. "Disability" includes physical and mental impairments that are "medically determinable" and so severe as to prevent the claimant from (1) performing her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U.S.C. § 423(a). A five-step sequential evaluation applies in disability determinations. 20 C.F.R. § 404.1520. Review ends with a dispositive finding at any step. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). Those steps are as follows:

1.  Has the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Part 404, Subpart P, Appendix 1?

4.  Considering the claimant's [Residual Functional Capacity], can he or she perform his or her past relevant work?

5.  Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC – – do significant numbers of other jobs exist in the national economy which the claimant can perform?

*See* 20 C.F.R. § 404.1520.

A claimant bears the burden of establishing benefits entitlement by proving the existence of a disability. *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). If a claimant meets that burden in steps one through four of the analysis set forth above, at step five, the burden shifts to the Commissioner to establish a claimant's ability to work. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). In conducting its review of the ALJ's decision, the Court may consider any evidence contained in the record regardless of whether it was cited by the ALJ. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## II.    PROCEDURAL AND FACTUAL OVERVIEW

Cortney Lowe ("Claimant") first applied for SSI benefits under Title XVI of the Social Security Act on April 21, 2017. (Tr. p. 19) ("Tr" and the page refer to the transcript of and relevant page from the administrative record as opposed to the court-affixed document and page number). She alleged disability as of the date of filing based upon certain physical and mental conditions. *Id.* Claimant's claim was denied on December 6, 2018 following a hearing before an ALJ. (Tr. p. 12). The Appeals Council denied her request for review on October 30, 2019. (Tr. p. 1).

The hearing in this matter was conducted by the ALJ on June 7, 2018, during which Claimant and a vocational expert ("VE") testified. (Tr. p. 15). In her ruling, the ALJ found that Claimant had not engaged in substantial gainful activity after her April 21, 2017 alleged onset date. (Tr. p. 17). The record reflects that Claimant was only twenty-three years old on the date her application for benefits was filed in this cause, qualifying her as a younger individual. (Tr. p. 23). She had obtained her high school diploma but had no past relevant work history. *Id.*

In her findings, the ALJ addressed the severity of Claimant's claimed impairments, finding that she had learning disabilities, depression, bipolar disorder, anxiety disorder and obsessive-compulsive disorder, which were all properly classified as severe impairments. (Tr. p. 17). The ALJ went on to determine that Claimant did "not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1..." (Tr. p. 18).

The ALJ then analyzed Claimant's residual functional capacity ("RFC") and found that she could perform work at all exertional levels but that she was functionally illiterate, could not have contact with the public, that direct/non-confrontational contact with coworkers and supervisors could only occur occasionally and that any workplace changes must be occasional and gradually introduced. (Tr. p. 19). In formulating the RFC, the ALJ states that she considered Claimant's testimony and reviewed her medical history as well as some education history. She also summarized several of Claimant's medical appointments and school interactions, noting the findings from each. (Tr. p. 20-23). The ALJ also considered the opinions of state agency medical reviewers, Brad Williams, M.D. and Annette Brooks-Warren, M.D. (Tr. p. 23). Ultimately, the ALJ determined that Claimant retained the ability to perform unskilled work through the date of her decision and that there are "jobs that exist in significant numbers in the national economy" that Claimant can perform. (Tr. p. 23-24).

## Consultative Psychological Evaluations Performed

### Evaluation by Martha Wike, PhD

Dr. Martha Wike examined Claimant on October 25, 2011. At that time, Claimant was eighteen years of age and had never driven. (Tr. p. 427). She lived alone in a mobile home provided to her by a family friend located close to her grandmother's home and her financial support was provided by her grandmother and an uncle as well as through limited government benefits. (Tr. p. 425). Claimant's grandmother provided the lion's share of Claimant's food with Claimant occasionally cooking only very basic things like macaroni and cheese or corn. (Tr. p. 427). Claimant generally bathed once a week (and occasionally her grandmother still assisted her with spots she could not reach), did her own laundry and cleaned her own house with some help from her grandmother. *Id.* Neither Claimant nor her grandmother had a vehicle and Claimant had no phone. *Id.* Claimant spent most of her time outside with her dog when weather permitted, watched some television, and

worked jigsaw puzzles although there is no indication of how complex the puzzles were that she worked. *Id.*

Upon inquiry, Claimant advised that her father had died of a massive heart attack when she was five years old and soon thereafter her mother took up with a sex offender and left Claimant to be raised by her grandmother because DCS either had or was going to remove her from her mother's home. (Tr. p. 425). Claimant was obese and reported that she had been made fun of as a result, also noting that she did not get along well with others. (Tr. p. 424-25). While Claimant graduated from high school, she received a special education diploma. (Tr. p. 425).

Dr. Wike observed that Claimant was properly oriented, and her affect was appropriate; however, her concentration was fair-to-poor, she could not adequately perform some of the simple tests Dr. Wike administered, and Dr. Wike noted that Claimant's ability to think abstractly was poor and that her judgment and insight were fair-to-poor. (Tr. p. 426). Following her examination of Claimant, Dr. Wike opined that Claimant's ability to understand and remember instructions is moderately impaired as a result of her level of cognitive functioning; her ability to sustain attention and concentration is probably moderately impaired as a result of her level of intellectual functioning; her ability to interact with other people is mildly to moderately impaired as a result of her general avoidance of other people and her level of cognitive ability; her ability to adapt to changes in her routine or work-like settings is moderately impaired as a result of her level of cognitive functioning and would not be able to do any job that required math skills or running anything like a cash register. (Tr. p. 429). She further opined that Claimant was operating at less than a fifth-grade level in reading and a less than a first- grade level in math and would be unable to manage her own finances. *Id.* Dr. Wike's report contained no notation indicating a lack of cooperation or effort by Claimant with regard to the testing or examination process.

## Evaluation by Dennis Spjut, Ph.D

Dr. Dennis Spjut conducted a psychological examination of Claimant on May 2, 2014. (Tr. 530). On the date of the examination, Claimant was 20 years old and pregnant. *Id.* Dr. Spjut found

her to be clean and casually attired and noted Claimant reported she was enjoying her pregnancy so far. *Id.* Claimant did not have a driver's license and was brought to the appointment by her uncle. She reported she had done a little practice driving and had tried to get her learner's permit once but failed the test. *Id.* Dr. Spjut's report stated Claimant was cooperative throughout the evaluation, but noted she had trouble clearly explaining her family history. *Id.*

Claimant advised Dr. Spjut that she did not stay with her mother as a child and that her mother would not take care of her. *Id.* She reported that her father passed away when she was three and that she blamed her mother for his death because "she cheated on him a lot." *Id.* Claimant also told Dr. Spjut that she and her siblings were taken away from their mother when she was seven or eight because their mother "got with" a registered sex offender who tried to rape her when she was six or seven while she was in bed sleeping but she got away from him. Claimant said her mother did not believe that he tried to rape her "so they took us away." (Tr. p. 531). Lowe reported she graduated high school in 2011 with a special education diploma. Dr. Spjut noted that Claimant had never had a job or earned any money. *Id.*

Claimant advised she lived with her grandmother until she was 18 years old and had lived with her uncle for a while. She reported she was currently living with her brother and his family. *Id.* Claimant helps some with household chores and watches 2-3 hours of television per day and sometimes listens to the radio. Claimant cannot read or count money well and cannot write a check. *Id.* When asked she said she has "maybe like two" friends and does not have a hobby. (Tr. p. 531-32). Claimant reported she sometimes experiences emotional turmoil when talking about her past. (Tr. p. 532). Dr. Spjut noted that no mental health records were available for review. *Id.*

Dr. Spjut administered several tests to measure Claimant's intellectual ability and determined she has a full-scale IQ score of 65, placing her in the mild intellectual disability range of intelligence classifications. (Tr. p. 533). Based on Claimant's test performance, Dr. Spjut concluded that Claimant generally would be able to understand simple oral instructions but would occasionally have difficulty understanding detailed oral instructions. (Tr. p. 534). He found Claimant to be functionally illiterate

and therefore opined all written instructions would be problematic. *Id.* Dr. Spjut also opined that Claimant "likely would be capable of maintaining schedules, attendance, and sustaining a routine in a sheltered workshop setting" and suggested Claimant contact vocational rehabilitation. *Id.* Dr. Spjut found Claimant to be capable of maintaining socially appropriate behavior in her peer group, but unlikely to interact effectively or confidently with the general public. *Id.* He opined she would likely be aware of most normal hazards, but may have some difficulty in taking precautions, mostly due to her obesity and her reported back and knee problems. *Id.* Dr. Spjut concluded Claimant is not capable of managing her own finances. *Id.*

**Evaluation by Shannon Wilson, Ph.D**

Claimant, who at the time was twenty-two years of age, was evaluated by Dr. Wilson on August 24 and 26 and September 8, 2015 at the request of DCS for purposes of determining her psychological and cognitive functioning. (Tr. p. 654). DCS referred Claimant after concerns arose about Claimant's ability to care for her daughter. *Id.* Dr. Wilson noted that Claimant was on-time for all but her third appointment. After initially misleading Dr. Wilson about the reason for being late, she ultimate advised Dr. Wilson that she was not on time because she had been subpoenaed to testify about a shooting that took place outside of her apartment. *Id.*

Claimant was accompanied by the father of her child, and she was described by Dr. Wilson as alternating between being friendly and cooperative and being defensive, evasive and rude. *Id.* Claimant advised Dr. Wilson that her child was taken from her after the child was hospitalized at Children's Hospital. *Id.* The hospital advised that they had great difficulty reaching Claimant and the child's father. Claimant stated that the reason for the difficulty is that both were sick for a ten-day period but prior to that time had been visiting the baby daily. *Id.* Apparently, Claimant's child had very serious health issues, with Claimant being able to recall the nature of most, but not all, of the child's conditions. (Tr. p. 655). When asked why the child had to be hospitalized, Claimant explained that the child's monitors went off for no apparent reason. *Id.* Claimant called her aunt to report the issue instead of calling 911 and ultimately her aunt got her and her child to the hospital where the

child was determined to be refluxing and suffering from pneumonia. *Id.* Claimant advised that she was living with her sister at that moment in time because there was no food in her house, as she had spent all her money on Christmas dinner. *Id.* She also advised that on another occasion, the child had stopped breathing and turned blue while the home health nurse was visiting. While Claimant and the child's father told Dr. Wilson that they felt comfortable using the child's G-tube, including programming the doses of medication and rate of feeding the child needed, Dr. Wilson noted that multiple progress notes from the child's medical providers stated that Claimant had struggled to calculate the proportions of formula and water correctly and required multiple re-trainings. *Id.* Medical professionals noted that Claimant had difficulty focusing during these trainings. *Id.*

Claimant advised Dr. Wilson she was working for a company that cleans up World's Fair Park after events and mainly works holidays and after special events. *Id.* Claimant's aunt was her primary source of transportation during this time. *Id.* Claimant reported that learning disorders run in her family and that she had been diagnosed with depression and anxiety. *Id.* Dr. Wilson noted that previous academic evaluations have resulted in Claimant being diagnosed with Borderline Intellectual Functioning and include notations that Claimant exhibits deficiencies in auditory memory, fluid reasoning, and comprehension. *Id.* Dr. Wilson took special noted of a 2008 evaluation that stated Claimant struggles and is critical of others and "with each submission to others, her resentment and bitterness may grow, and surges of anger may break through her façade of propriety." (Tr. p. 655-56).

Based on her interview, observations, and psychological testing of Claimant Dr. Wilson concluded that Claimant's suffers from Mild Intellectual Disability, Specific Learning Disorder with impairment in mathematics, and Unspecified Personality Disorder with Paranoid and Avoidant Features. (Tr. p. 656). Dr. Wilson also found that Claimant meets the criteria for an Unspecified Anxiety Disorder and an Unspecified Depressive Disorder. *Id.* Dr. Wilson opined that Claimant was not capable of managing the calculations and preparations necessary to prepare and administer her child's feedings for several reasons. *Id.* Specifically, Dr. Wilson found that Claimant's insufficient

math skills, her tendency to become easily frustrated and give up or guess when she is unsure, and her high level of resistance to admitting shortcomings and asking for help rendered her unable to adequately manage her child's feedings. *Id.*

Dr. Wilson's report also stated that Claimant's test scores showed significant weakness in the areas of verbal abstract reasoning, arithmetic, short-term visual memory, and learning ability. (Tr. p. 657). Claimant's visual-spatial skills and visual scanning speed are areas of strength for her but are still below average. *Id.* Claimant's Full-Scale IQ of 71 places her at the extreme low end of the Borderline range of intellectual functioning, and in the 3rd percentile for her age group. (Tr. 657-58). Claimant's math skill level is between 2nd and 4th grade, depending on the type of math involved. (Tr. 657). Claimant's functioning is equivalent to a 1st grade level with regard to remembering what she hears, and she has a 4th grade ability to understand and follow verbal directions. (Tr. p. 659). Dr. Wilson found Claimant's reading comprehension ability to be consistent with the expectation for a child in 5th grade. *Id.* Claimant's test performance also suggest she experiences a "moderately severe mental disorder," possesses insufficient coping strategies, and struggles to regulate her emotional experiences and behavior and may increasingly exhibit a tendency to be argumentative and mistrustful. *Id.*

<u>**Consultative Medical Reviews**</u>

<u>**Review by Brad Williams, M.D.**</u>

Dr. Brad Williams completed a review of Claimant's medical records on June 19, 2017 during Claimant's initial DIB determination. (Tr. p. 137-45). Dr. Williams noted Claimant's treatment for anxiety and depression in September 2016 and her admitted use of marijuana. (Tr. 141). His review of her February 2017 records noted "better on meds." and mentioned "adequate attention" for both February and March 2017. *Id.* However, his report noted that in May 2017 Claimant was "improved on Depakote but forgot to take it most days" and was "upset due to boyfriend leaving her." *Id.* Dr. Williams also stated Claimant "gets angry with people and "doesn't like orders." *Id.*

Based on his review of Claimant's medical records, Dr. Williams opined that while Claimant's medical diagnosis could cause the stated symptoms, the medical record does not fully support the severity of Claimant's stated limitations. *Id.* Dr. Williams found that Claimant's symptoms are "generally consistent" with the medical record and diagnoses in the record that reflect moderate mental component based on clinical findings of "adequate attention" on mental status examinations and "generally euthymic mood." *Id.* Dr. Williams concluded Claimant's ability to remember places and work procedures and short and simple instructions were not significantly limited but her ability to understand and remember detailed instructions was markedly limited. (Tr. p. 143-44). He also found Claimant to have sustained concentration and persistence as well as social interaction limitations. (Tr. p. 144).

Ultimately, Dr. Williams opined Claimant is able to perform simple tasks but not more complex tasks without significant difficulty and is likely to have some but not substantial difficulty in sustaining an ordinary work routine and complete a normal work week with acceptable performance productivity. (Tr. p. 145). He further opined Claimant is unable to interact with the general public but would be okay with supervisors and coworkers with occasional disruptions due to psychological based symptoms and is able to be aware of and appropriately respond to infrequent changes in the workplace. *Id.*

### Review by Annette Brooks-Warren, M.D.

Dr. Annette Brooks-Warren completed a review of Claimant's medical records on August 27, 2017 during reconsideration. (Tr. 149-62). Dr. Brooks-Warren reviewed the record and considered two additional visits to Cherokee Health System after the initial consultative evaluation in addition to those reviewed by Dr. Williams. (Tr. 152-56). The additional records on June 26, 2017 and August 8, 2017 indicate claimant suspected pregnancy in June and confirmed she was twelve weeks pregnant and experiencing thyroid issues in August. (Tr. 155-56) Claimant reported improved handling of anxiety at the June appointment followed up by an observation of normal mood and affect in August. *Id.*

Dr. Brooks-Warren affirmed the original findings as to initial mental residual function capacity (MRFC) and psychiatric review technique (PRT), after determining that while "Claimant's MDI could cause stated symptom, the MER [did] not fully support the severity of state limitations as fully consistent." *Id.*

## Claimant's Treatment Records [2]

### Cherokee Health Systems

The transcript contains extensive treatment records from Cherokee Health Systems dating back to September 2016. (Tr. 539-657). The Court will not summarize each visit but will instead summarize Claimant's overall treatment history with the facility. In 2016, Claimant was noted to have major depressive disorder (single episode), morbid obesity and depression of an unspecified type. (Tr. p. 543). Records note that at various times during this period Claimant's symptoms included diminished concentration, excessive fear or anxiety, panic attacks, delayed reactions, poor judgment, pressured speech, fair reasoning, and poor impulse control, insight and judgment. (Tr. p. 552, 568). Claimant self-reported that functioning was very difficult due to depressed mood and fatigue. (Tr. p. 546). She noted that she would become tense and fearful and have episodes where she was unmotivated and would having crying spells for no reason. Additionally, she advised on one visit that she had recently experienced three panic attacks in a single night and that her mouth went numb during the attack. (Tr. p. 566). Claimant also reported that the loss of her daughter after a year-long DCS investigation was causing stress for her. (Tr. p. 552). Claimant was counseled on anxiety attacks and prescribed mental health medications. (Tr. p. 544, 549). Of note, Claimant did admit to using marijuana to calm herself. (Tr. p. 553).

---

[2] Claimant's argument involves primarily psychological rather than physical functioning; therefore, the Court notes it has considered Claimant's records from Tennova North Hospital but finds those records to be of limited value to the issues presently pending before the Court. The records do confirm Claimant's claim of having spina bifida and demonstrate that she has mild posterior element degenerative changes which the radiologist found unusual for someone of Claimant's age as well as mild degenerative changes in all three compartments of her knee with slight medial join space loss. (Tr. p. 503-504).

In 2017 Claimant was noted to be tearful, angry and anxious, with poor hygiene on one visit, to have excessive speech and a labile effect. (Tr. p. 539). She was further noted as having mostly poor and occasionally fair judgment and insight and had a very child-like presentation. *Id.* On one occasion her thought processes were found to be tangential. *Id.* Multiple adjustments were made to Claimant's mental health medications during this time period. *Id.* A treatment team note indicates that one of Claimant's therapists believed her to have cognitive disabilities. (Tr. p. 572).

Claimant noted that she continued to experience emotional difficulty, including anger, because her daughter had been taken from her, as well as because significant family members had died and then her boyfriend had left her. (Tr. p. 541, 556). During much of this period, Claimant was hitting her head and cutting her wrist, although on one visit Claimant did report that she had been able to refrain from the cutting for a while. (Tr. p. 541, 556, 558, 564). Claimant was also noted to be having difficulty getting along with family members and was acting out in anger. (Tr. p. 560, 562). Claimant also advised that she had been unable to appear for certain follow up appointments because of transportation and family issues. (Tr. p. 556).

During 2017, Claimant's records do note some positives such as that she was reading books although the records do not indicate what type or the reading level. (Tr. p. 550). Those records also indicate that changes in Claimant's medications had provided her with some improvement in her mood regulation in that she was calmer and better able to handle stress, but the records note that she continued to experience anxiety and depression. (Tr. p. 554). Additionally, there were times where her reasoning, attention and impulse control were noted to be appropriate. (Tr. p. 556).

**Reliant Family Health**

Records from Claimant's treatment through Reliant Family Health include complaints and treatment for psychiatric and mental health conditions. On January 23, 2013, Claimant appeared before Emily Harless, FNP, to discuss symptoms of depression. (Tr. p. 445). Ms. Harless was advised at that time that Claimant was visiting Michelle Barrett Hilton for therapy and was further advised that Claimant had denied suicidal ideations. *Id.* In light of Claimant's generalized complaint, Claimant

was prescribed one 25 MG dose of Sertraline HCI daily. (Tr. p. 446). At a follow up visit on February 26, 2013, Claimant reported no changes or new complaints and advised she felt no improvements since being prescribed Zoloft although she did advise she had no suicidal or homicidal ideations. (Tr. p. 448). At the February visit, Ms. Harless increased Claimant's Sertraline dosage to 50 mg/day. (Tr. p. 450). Then, in March 2013, Claimant appeared again to report that her antidepressant was not working and advise that she wanted to discuss the possibility that she suffered from bipolar disorder. (Tr. p. 454). Claimant noted she thought her Zoloft prescription needed to be increased and advised she had considered the possibility of bipolar disorder based on her therapy sessions which she participated in every two weeks. *Id.* In response, Ms. Harless increased Claimant's dosage of Sertraline to 100 mg/day. (Tr. p. 456). In April 2013, Claimant appeared before Ms. Harless and advised that the increased dosage of Sertraline made Claimant feel much better. (Tr. p. 458). Thereafter, in June 2013, Claimant again appeared before Ms. Harless to discuss changing her antidepressant noting stressors at home and to report her concern that her current regimen was not controlling her depression or anxiety. (Tr. p. 460). In response, Ms. Harless prescribed Claimant CeleXA 20 mg/day for depression. (Tr. p. 462). Claimant later appeared in July 2013 for a follow up after increasing her CeleXa dosage to 40 mg/day, and Claimant advised the new regimen was working well. (Tr. p. 463). The July change was the last modification in dosage contained in Claimant's records from Reliant Family Health.

### Claimant's Education Records

Claimant's school records were provided by Union County High School. (Tr. p. 322-423). Those records indicate that Claimant required an Individualized Education Plan ("IEP") throughout her years in school and graduated high school with a special education diploma. *Id.* These records are voluminous and much of the information is repetitive and/or duplicative; therefore, the Court will summarize some of the more notable information contained therein. The records contain an evaluation of Complaint's abilities completed by Stuart W. Turner, Claimant's math resource class teacher for two years. *Id.* Mr. Turner opined that Claimant was able to do the math work he taught in class and

that he believed she should be able to perform unskilled labor. (Tr. p. 324-325). At the same time, he stated that Claimant's behavior issues prevented her from learning and focusing on schoolwork and that she should not handle money. *Id.*

Claimant's school records also include a psychological evaluation that was performed in 2003 by Nancy McLees Crabtree, Ed. S., NCSP, a school psychologist when Claimant was nine years of age. (Tr. p. 329, 332). Dr. Crabtree noted that Claimant was having difficulty in all academic areas, including attaining readiness skills in kindergarten. (Tr. p. 330). She further noted that Claimant had been certified as a learning-disabled student in 2000. *Id.* Dr. Crabtree also documented that Claimant was experiencing behavioral problems and had a very high activity level and difficulty controlling impulsive tendencies as well as difficulty relating to her peers, tending to try to control other students. *Id.* There was a note that her ability to attend and focus had improved somewhat and that she appeared to be more motivated. Claimant was noted to have difficulty with math, reading, written expression, organization and completing tasks timely. *Id.*

Dr. Crabtree's report also notes that Claimant's regular classroom teacher noted that Claimant required significant modifications to complete assigned tasks and that she had provided abbreviated assignments because Claimant experienced difficulty retaining previously learned information and would become frustrated when she could not do assigned work. (Tr. p. 331). The resource teacher noted that Claimant tended to give up when she could not complete assigned tasks. *Id.* The teachers did note that the reported behavior was a significant improvement from what it had been two years earlier. *Id.* T-CAP testing for Claimant indicated that she was in the 3rd percentile. *Id.* Dr. Crabtree noted that her testing revealed that Claimant was functioning within the borderline intelligence range. (Tr. p. 333).

## Claimant's Testimony

During the hearing before the ALJ, Claimant testified that she was single, had two children and lived with her uncle and aunt, her cousin and her cousin's two children. (Tr. p. 35). While

Claimant had two children, she testified that her oldest child had been adopted and did not live with her, while her six-month old did reside with her. (Tr. p. 35). Claimant testified that her uncle and aunt pay for the household expenses but that she did receive food stamps and Families First benefits. (Tr. p. 36). She stated that she had never had a driver's license, noting that her uncle provided transportation when she had somewhere to go and in fact had accompanied her to the hearing. (Tr. p. 37).

Claimant was asked about her height and weight and she noted that she was 5' 2" tall but wasn't sure of her weight although she thought it was about 240 lbs. *Id.* She also testified that she had a high school diploma but had taken special education classes. *Id.* Claimant admitted that she had difficulty with math in school but was unsure of what other subjects were problems for her. (Tr. p. 38). When asked about whether she was able to handle her own finances, Claimant stated that she had to have help. (Tr. p. 38). Claimant was also asked about any jobs she had previously held. *Id.* Claimant testified that she worked at an Express Inn as a housekeeper in 2016 for a short time but was fired because she did not get along with most of the people and her boss said that he did not like the way she worked and that she had a horrible attitude. *Id.* Claimant recalled that her boss and hotel guests cussed at her "a lot," and that her boss told her co-workers daily that she was not cleaning the rooms properly. (Tr. p. 38-39, 50). She did explain that she probably only had to redo rooms every other day. (Tr. p. 50).

Claimant also testified that she had worked part-time for a couple of months at World's Fair Park cleaning up at events and changing the trash but could not do the work because she was walking all the time which was difficult because she had spina bifida and her knees were deteriorating so her back "and stuff was hurting a lot." (Tr. p. 39). Lastly, she said that she had worked for a call center where she called people from her computer and tried to get them to sign up for a campus tour with ITT, as best she could recall. (Tr. p. 39-40). Claimant noted that while working, she had some panic and anxiety attacks. (Tr. p. 52).

When Claimant was asked why she thought she could not work full time, she stated that she does not get along well with others, gets upset easily, and does not do well in crowds of people with her defining a crowd as 4-5 people. (Tr. p. 40-41). She further advised that she has panic attacks and said that she had last had one right before her son was born (which would have been about six months prior to the hearing, given the age of her son). Claimant stated that the panic attacks last from 10 to 30 minutes. *Id.* When asked about how she deals with issues of becoming upset with others, Claimant noted that she generally walked away and tried to stay away from people. (Tr. p. 41). She also testified that she did not go out by herself and does not leave the house much unless it involves doctor's appointments for herself or her son or going with her family to the grocery store or to pay bills. (Tr. p. 45). Claimant also explained that while pregnant with her son she had panic attacks while at Sam's Club with her family and while trying to eat a meal with her family at Hardee's. (Tr. p. 45, 52). As a result of the incident at Hardee's, Claimant said that her family does not go inside restaurants to eat anymore. (Tr. p. 52). Notably, Claimant had not yet begun taking the mental health medications she was taking at the time of the hearing when these panic attacks occurred. (Tr. p. 53).

Claimant testified that she was receiving treatment at Cherokee Mental Health with therapy taking place about every three weeks and meetings for her medication occurring roughly every other month. *Id.* She also noted that she did not generally have time for physical health appointments because of her son's need for treatment. (Tr. p. 42-43). Claimant reported that DCS was "watching" her as it related to her son and that she had two different types of in-home services, with one being provided monthly and a second being provided on a weekly basis. *Id.* While Claimant advised that she was able to care for her son, she also stated that she received significant help from her aunt and uncle in caring for him. (Tr. p. 43). Apparently, DCS became involved with regard to Claimant's son because she tested positive for marijuana during her pregnancy, which Claimant noted she used before knowing that she was pregnant because it helped with her anxiety and further stated that DCS had closed its case file as to that issue. (Tr. p. 47). Claimant further stated that the reason for her anxiety and depression was that DCS took her first child from her, referring to her daughter that by the time

of the hearing had been adopted by third parties that Claimant did not know. (Tr. p. 48-49). Claimant understood that the person who performed her evaluation in relation to her daughter had determined that she was mentally retarded, which factored into the judge's reason for not giving her daughter back to her. (Tr. p. 48).

## III.  ANALYSIS

The overarching issue for review is whether the ALJ's decision is supported by substantial evidence. Claimant argues that the ALJ's erred in determining that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Specifically, Claimant alleges that she meets the criteria of Listing 12.05B (Intellectual Disorder). Claimant further contends that the ALJ erred by assigning Claimant a moderate limitation with regard to concentrating, persisting, or maintaining pace and understanding, remembering, or applying information. Additionally, Claimant states the ALJ's RFC determination is "inconsistent with the records and is not substantially supported by the evidence contained therein." [Doc. 16, p. 7].

### a.  The ALJ's Determination That Claimant Does Not Have an Impairment or Combination of Impairments that Meets or Medically Equals a Listed Impairment

The ALJ evaluated Claimant under the criteria of listings 12.04 (depressive, bipolar and related disorders) and 12.11 (neurodevelopmental disorders) and determined that Claimant did not meet or medically equal the criteria of either listing. (Tr. p. 18). Claimant takes the position that, based upon her specific impairments and limitations, the ALJ should have evaluated Claimant as to listing 12.05 (Intellectual Disorder) and that she meets the criteria for listing 12.05B.

Whether evaluating Claimant under listing 12.04, 12.11 or 12.05, the ALJ is called upon to evaluate whether Claimant has any limitations in understanding, remembering, or applying information as well as whether she has any limitations in concentrating, persisting or maintaining pace. When the ALJ evaluated Claimant's ability to understand, remember and persist pursuant to listings 12.04 and 12.11, she found Claimant be moderately limited. (Tr. p. 18). As her sole support

for this proposition, the ALJ stated that Claimant had no difficulty in following one and two-step instructions at medical encounters or describing her work history; however, the ALJ did not reference any of the evidence of record which caused her to form this opinion. *Id.* The Court does note that when testifying before the ALJ, Claimant was able to recall some information regarding her unsuccessful attempts to work in the past[3]. (Tr. p. 38-40, 50, 52).

The ALJ also found that Claimant was only moderately limited in her ability to concentrate, persist and maintain pace. (Tr. p. 18). In support of this finding, the ALJ stated that Claimant manages her own legal, medical, and financial affairs and is the primary caregiver for a premature newborn. *Id.* The ALJ provides no explanation from the record for how she reached her conclusions that Claimant performs such tasks and fails to explain why directly contradictory evidence in the record is discounted.

Specifically, as reflected above, numerous portions of the record support the conclusion that Claimant cannot and does not handle her own financial affairs. For example, both Dr. Wike and Dr. Spjut concluded that Claimant was incapable of managing her own finances and Claimant testified during the administrative hearing that she needed help with her personal finances. (Tr. p. 38, 429, 534). Also of note, while the ALJ cited to the opinion provided by Claimant's resource math teacher from high school stating that Claimant was able to perform the work in his class and should be able to now be employed, she does not mention his statement that Claimant's behavior issues prevented her from learning and focusing on schoolwork and that she should not handle money. (Tr. p. 324-325).

Additionally, while the ALJ references that Claimant was able to obtain an Order of Protection for herself in support of her ability to handle her own legal affairs, the ALJ does not point to any

_____

[3] Claimant took the position in her brief that the ALJ erred in concluding that Claimant had no difficulty in describing her work history because she had no work history to describe; however, Claimant had attempted to work at three jobs in the past which she described during the hearing. The mere fact that these were unsuccessful attempts at work that did not qualify as substantial gainful activity do not prevent them from constituting "work history" as the term was used by the ALJ in this portion of her findings.

information in the record as to how the fact that a Court issued Claimant this order supports such a conclusion. Of further note, Claimant engaged in a year-long battle with DCS for custody of her oldest child, which she ultimately lost with the end result being that Claimant's child was adopted by unrelated third parties. (Tr. p. 552). Claimant indicated that this was in significant part as a result of her intellectually functioning, an assertion supported by the evaluation records of Dr. Wilson outlined above. (Tr. p. 655, 657-658). While the record does establish that Claimant has custody of her son, the record also demonstrates that Claimant receives significant assistance in caring for him from the family members with whom she resides and has been monitored by DCS. (Tr. p. 42-43). She has also been provided with in-home services to assist her in parenting. *Id.* The ALJ makes no mention of the parenting assistance provided to Claimant.

The Court also observes that Claimant's medical records and evaluative reports summarized above include multiple references to Claimant's limitations in concentrating, persisting and maintaining pace. (Tr. p. 38-39; 50; 552-568). In fact, Claimant's educational records, which ALJ gives little mention, make it clear that these functions have been challenges for Claimant since her elementary education days. (Tr. p. 322-423). Moreover, the records of Cherokee Health Systems indicate current and significant issues with Claimant's functioning in these areas. (Tr. p. 539-657).

In determining whether the ALJ properly assessed Claimant's limitations in these areas, the Court must evaluate whether substantial evidence supports the ALJ's conclusions. "Substantiality of the evidence must be based upon the record taken as a whole." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (citing *Allen v. California*, 613 F.2d 139, 145 (6th Cir. 1980)). The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight and does not permit a decision to be focused and based upon some evidence while disregarding other pertinent evidence in the record. *Id.*; *see also Beavers v. Secretary of Health, Education and Welfare,* 577 F.2d 383, 387 (6th Cir.1978), *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978). The substantiality test is not satisfied if the decision is based upon only some evidence in the record and ignores or fails

to resolve a conflict created by countervailing evidence. *See Rogers v. Sec. of Health and Human Svs.*, 786 F.2d 1166 (6th Cir. 1986); *see also Brothers v. Colvin*, 233 F. Supp. 3d 320, 328 (N.D.N.Y. 2017) (finding error where the ALJ failed to address substantial evidence contrary to her conclusion regarding claimant's functioning, such as claimant's learning disability and attendance of special education classes and inability to handle funds).

The Commissioner argues that the ALJ's determinations were proper because there is a lack of objective evidence supporting Plaintiff's asserted mental impairment and cites *Stanoski v. Astrue*, 532 F. App'x 614 (6th Cir. 2013) in support of this contention. In *Stanoski*, the claimant alleged mental impairments that affected her on a daily basis, evidenced by crying spells and low energy but there was "no objective medical evidence to support these complaints." 532 F. App'x at 619. The *Stanoski* Court found the ALJ did not err in failing to accept the subjective complaints of claimant in the absence of supporting objective medical evidence. *Id.* Here, unlike in *Stanoski,* the record does include objective medical evidence of Claimant's alleged mental impairments, including evaluations by multiple mental health professionals, Claimant's education records, and the results of numerous psychological tests, with these records dating all the way back to Claimant's early childhood years. The ALJ simply failed to address the existence of most of this evidence in her determination.

As an initial matter, the Court observes that an ALJ's decision is not subject to reversal even where there is significant evidence in the record to support a conclusion other than the one reached. *Kyle v. Comm'r of Soc. Sec.,* 609 F.3d 847, 854-855 (6th Cir. 2010). At the same time, in the case at hand, the Court notes that the ALJ's step-three analysis is almost entirely devoid of any reference to Claimant's negative assessment results or medical opinions. Instead, the ALJ simply makes the bare-bones conclusion that Claimant manages her own financial, medical and legal affairs and is the primary caregiver for her son without any significant explanation or support for this conclusion and without referencing why information contained in the record which contradicts these conclusions should not be provided weight. [If] the reasons given by the trier of fact do not build an accurate and

logical bridge between the evidence and the result" the decision cannot stand. *Parham v. Commissioner of Social Security,* No. 1:19-CV-2236, 2021 WL 408998 at *2 (N.D. Ohio Feb. 5, 2021) (citing *Fleischer v. Astrue,* 774 F.Supp.2d 875,877 (N.D. Ohio 2011)). The ALJ may well have had proper reasons for reaching the conclusions that she did as to Claimant's ability to understand, remember, and apply information as well as to concentrate, persist and maintain pace; however, because she did not cite to evidence in the record to support these conclusions and did not address why she failed to credit the substantial evidence in the record contradicting the conclusions, the Court cannot find that the ALJ provided the necessary "accurate and logical bridge." As a sister jurisdiction has aptly noted in a case with significant similarities to the instant action, such unexplained conclusions in direct contradiction to evidence of record cannot be supported by substantial evidence. S*ee Lataures L. v. Comm'r of Soc. Sec.*, No. 4:18-CV-00067, 2020 WL 2066756, at *5 (W.D. Va. Mar. 27, 2020), *report and recommendation adopted*, No. 4:18-CV-00067, 2020 WL 2065872 (W.D. Va. Apr. 29, 2020) (finding error where the longitudinal evidence of record bore directly on claimant's overall ability to function independently, appropriately, and effectively and undermined the ALJ's otherwise unexplained assessment of claimant's functioning).

Additionally, while this Court may not resolve conflicts in evidence or decide questions of credibility, it is appropriate for the Court to look to portions of the record the ALJ did not discuss or cite when assessing whether a decision is supported by substantial evidence. *See Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Given the volume of evidence in the record which appears to contradict the findings made by the ALJ and the limited explanation provided by the ALJ for reaching the conclusions she did, the Court finds that the ALJ failed to take into account the record as a whole in making her determination and as such, the matter must be remanded to the Commissioner for further consideration.

While the Court acknowledges Claimant's contention that the ALJ further erred in not evaluating her pursuant to listing 12.05B, the Court need not reach that issue as it has concluded that the matter must be remanded because the ALJ's conclusions as to Claimant's ability to understand, remember, and apply information as well as to concentrate, persist and maintain pace were not supported by substantial evidence. Upon remand, the Commissioner will have an opportunity to reconsider whether Claimant should also be evaluated under this listing.

### b. ALJ's RFC Determination

Finally, Claimant argues that the ALJ's determination of her RFC is inconsistent with the record and not supported by substantial evidence. The Court need not address this argument as this matter is being remanded for further consideration on other grounds. Additionally, by generally alleging the RFC determination was inconsistent with the record without alleging specific error by the ALJ, Claimant effectively asked the Court to reweigh the evidence which is beyond the scope of this Court's review. *See Cox v. Benefits Rev. Bd.*, 791 F.2d 445, 446 (6th Cir. 1986) (stating a general contention without raising specific allegations of error by the ALJ is equivalent to a request to reweight the evidence of record).

### IV. CONCLUSION

After a careful review of the entire record in this cause, the Court finds that the ALJ did not take into account all evidence of record in determining whether Plaintiff's impairments meet or medically equal the severity of a listed impairment and the ALJ's step-three conclusions appear to be inconsistent with the record as a whole. For these reasons, Plaintiff's motion for judgment on the pleadings [Doc. 15] is **GRANTED** and the Commissioner's motion for summary judgment [Doc. 18]

is **DENIED**.  Pursuant to 42 U.S.C. § 405(g), the case is **REMANDED** for further consideration

consistent with this Amended Memorandum Opinion and Order.

SO ORDERED:

s/Cynthia Richardson Wyrick
UNITED STATES MAGISTRATE JUDGE